Lake James Hammond Perriguey, OSB 983213
lake@law-works.com
Law Works LLC
1906 SW Madison Street
Portland, OR 97205
503-803-5184
Fax 503-334-2340

Dan Booth, MA Bar #672090 (admitted *pro hac vice*)
dbooth@boothsweet.com
Booth Sweet LLP
32R Essex Street
Cambridge, MA 02139
617-250-8602
Fax 617-250-8883

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MICHAEL G. SCHWERN**, | Case No. 3:14-cv-00146-PK |
| Plaintiff, | |
| v. | **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO LIFT STAY PENDING APPEAL FOR A LIMITED PURPOSE** |
| **NÓIRÍN PLUNKETT**, | |
| Defendant. | |

Defendant Nóirín Plunkett ("Plunkett") respectfully submits this response in opposition to Plaintiff Michael G. Schwern's ("Schwern") Motion to Lift Stay Pending Appeal for a Limited Purpose (Doc. 44, "Motion to Lift Stay"). The Motion to Lift Stay should be denied because it is both procedurally and substantively improper, lacks both factual and legal

foundation, and wrongly seeks to further impinge on Plunkett's immunity from suit, as further explained below.

## PROCEDURAL HISTORY

Schwern filed the Complaint on January 27, 2014. Doc. 1. Plunkett was served with process on January 31, 2014. Plunkett filed a special motion to strike on February 20, 2014. Doc. 4 ("Anti-SLAPP Motion"). The Court denied the Anti-SLAPP Motion on July 7, 2014. Doc. 25. Plunkett noticed an appeal on July 8, 2014. Doc. 26. Pending appeal of the denial, Plunkett moved to stay all proceedings in this Court, pursuant to both Fed. R. App. P. 8(1)(A) and ORS 31.152(2). Doc. 29 p. 1. Plunkett argued that "Oregon's anti-SLAPP law provides for immunity from suit rather than just a defense from liability" and that "the substantive policies of the anti-SLAPP law would be seriously impaired if a plaintiff could bring a SLAPP suit and wear the opposing party down in discovery while the anti-SLAPP motion is pending." *Id.* pp. 4-5; *see also* Doc. 32 p. 5 ("Oregon's anti-SLAPP law provides for substantive immunity from suit, and allowing litigation to proceed in the trial court while the denial of an anti-SLAPP motion is on appeal would be antithetical to that immunity.").

On August 15, 2014, the Court ordered a stay of not just discovery but all proceedings. Doc. 38 ("Stay Order") p. 3 (finding that "Plunkett's motion for stay of these proceedings is well taken"). As the Stay Order noted, the Ninth Circuit allowed Plunkett's appeal to proceed without requiring a Rule 54(b) certification that the order denying the Anti-SLAPP Motion was final and appealable. *Id*. Therefore, the Court reasoned, Plunkett's right to appeal "would necessarily stem from adoption of her plausible interpretation of the statute as providing immunity from suit rather than (mere) defense against liability." *Id*. "[I]t would entirely defeat the purpose of the statute to permit this action to proceed pending the outcome of Plunkett's appeal, in that even if

Plunkett were ultimately entirely successful before the Ninth Circuit, absent a stay of trial-court proceedings she would still have been subjected to the necessity of litigating claims from which she presumptively should have been granted complete immunity." *Id*.

Without conferring with Plunkett's counsel, Schwern filed the Motion to Lift Stay on May 4, 2015, seeking to litigate a Motion for Sanctions (Doc. 45) filed the same day. The Court set a June 23, 2015, hearing date on both motions and a May 22, 2015 deadline for responses. Doc. 53. On May 22, 2015, Plunkett moved the Court to extend the time for a response to the Motion for Sanctions, pending resolution of the Motion to Lift Stay. Doc. 54. On May 29, 2015, the Court granted Plunkett's motion for an extension of time. Doc. 56.

## FACTUAL BACKGROUND

Plunkett and Schwern were married on November 11, 2011. Doc. 5 ("Anti-SLAPP Motion") p. 2. On November 24, 2012, Schwern sexually assaulted Plunkett at their home. *Id*. He moved out, but continued to behave in a sexually, physically, and emotionally abusive manner toward Plunkett, and they filed for divorce on September 19, 2013. *Id*. Hours later, at her home in Portland, he forced her to perform oral sex upon him, had intercourse with her over her repeated objections, choked her with his hands, and penetrated her with a knife. *Id*. She was taken to the emergency room, and police were contacted and responded; she underwent a sexual assault forensic examination; her injuries were photographed. *Id.* pp. 2-3. He was arrested that night and charged with strangulation and harassment. Doc. 1 ("Complaint") ¶ 11. Plunkett moved to Cambridge, Massachusetts two days later. Anti-SLAPP Motion p. 3.

On September 30, 2013, Senior Deputy District Attorney Christine Mascal informed Schwern's counsel that Plunkett would be testifying to a grand jury about his sexual offenses against her. Complaint ¶ 12. However, having moved to Massachusetts, Plunkett resolved to put

the matter behind her and informed prosecutors, on or about October 23, 2013, that she did not wish to proceed with the prosecution. Anti-SLAPP Motion p. 3. On November 12, 2013, Schwern sent Plunkett an email that prompted her to obtain a restraining order against him. *Id*.

Schwern filed the Complaint on January 27, 2014, Plunkett's birthday. Anti-SLAPP Motion p. 3. The same day, Plunkett received a delivery at her residence of six white roses, which she believed Schwern sent. *Id*. Schwern and Plunkett shared an interest in World War Two history, and had discussed the story of the execution of six leaders of the White Rose, a German resistance group. *Id*. January 27, International Holocaust Remembrance Day, is traditionally commemorated with white roses in their honor. "The significance of her birth date and the six white roses coincides with the execution of six members of the underground White Roses Group during World War II." Doc. 6 p. 9 (police incident report). No note stated the place of origin or who sent the flowers. *Id*. A police investigation revealed the flowers had been ordered online by someone who identified himself as "Michael S." Anti-SLAPP Motion p. 3. Specifically, they were ordered from a Cambridge florist through the online service TaskRabbit. Doc 6 p. 9. Plunkett first learned of the Complaint when served with process on January 31, 2014.

Nearly a year later, despite the Court's Stay Order, Schwern's counsel issued a subpoena to TaskRabbit for evidence related to the rose delivery. Doc. 46 p. 4. The subpoena was issued from the Cambridge District Court, where Plunkett had obtained the restraining order. *Id*. TaskRabbit produced responsive documents to Schwern on January 29, 2015. Doc. 45-1 p. 11.

## LEGAL STANDARD

> All discovery in the proceeding shall be stayed upon the filing of a special motion to strike under ORS 31.150. The stay of discovery shall remain in effect until entry of the judgment. The court, on motion and for good cause shown, may order

that specified discovery be conducted notwithstanding the stay imposed by this subsection.

Or. Rev. Stat. § 31.152(2).

## ARGUMENT

### I. The Motion to Lift Stay Is Procedurally Improper.

The Motion to Lift Stay violated the local rule requiring a certification that the parties conferred. LR 7-1(a). That is because Schwern never conferred with Plunkett or Plunkett's counsel about the Motion to Lift Stay before filing. Undersigned counsel had notified Schwern's counsel by letter on April 30, 2015, that his Motion for Sanctions would not justify lifting the stay. Exhibit A. Instead of conferring, Schwern's counsel simply mailed the Motion to Lift Stay to Plunkett and her counsel the day it was filed. Motion to Lift Stay, p. 3.

Schwern recognizes the Local Rule's importance. He filed a separate certificate detailing his compliance with regard to the Motion for Sanctions. Doc. 47. As the certificate reflects, Schwern chose not to confer before filing the Motion to Lift Stay, which he drafted only after the parties conferred on the Motion for Sanctions. *Id.* ¶ 9. Yet the docket shows that Schwern misleadingly identified the certificate as related to both motions. The filing violates both the letter and spirit of the Local Rule and should therefore be denied.

### II. The Motion to Lift Stay Is Legally Insufficient.

The Stay Order is grounded in Plunkett's total immunity from suit. *Id.* p. 3. The Motion to Lift Stay directly violates that immunity and directly attacks it without a legitimate basis.

Schwern argues that "the correct resolution of the Rule 11 motion is logically independent of ... the reasons underpinning the statutory basis for a stay furnished by Or. Rev. Stat. § 31.152(2)." Motion to Lift Stay, pp. 1-2. That argument flies in the face of the legislative history of the statute and the case law construing it. The principle underlying the stay provisions

and the statute overall, to avoid needless expense for defendants, fully supports maintaining the stay of all proceedings.

> During their consideration of this statute [Or. Rev. Stat. § 31.150 *et seq.*], legislators explained that its purpose is to provide for the dismissal of claims against persons participating in public issues, when those claims would be privileged under case law, before the defendant is subject to substantial expenses in defending against them.
>
> *Staten v. Steel*, 222 Or. App. 17, 29 (2008).
>
> [A]lthough discovery is automatically stayed by the filing of a special motion to strike, the court has discretion to permit specified discovery if a showing of good cause is made. As part of their consideration of the statute, legislators explained that the reason for this procedure was to prevent expensive, protracted litigation in the types of cases covered by the statute and that, to obtain discovery, a plaintiff would have the burden to show a need for discovery and courts would have discretion to decide whether to allow it.
>
> *Page v. Parsons*, 249 Or. App. 445, 456-57 (2012) (citing *Staten*).

"Anti-SLAPP statutes are designed to allow the early dismissal of meritless lawsuits aimed at chilling expression through costly, time-consuming litigation." *Northon v. Rule*, 637 F.3d 937, 938 (9th Cir. 2011). Defendants immune from suit should not be subjected to the costs of motion practice or other litigation. The statute is construed consistently in favor of movants; each section of the statute (be it the stay provision in section 31.152(2), or the two-step, burden-shifting process set forth in section 31.150(3)) "shall be liberally construed in favor of the exercise of the rights of expression described in ORS 31.150(2)." Or. Rev. Stat. § 31.152(4). The special motion to strike "is logically prior to a decision on the merits. The anti-SLAPP statute provides defendants with a mechanism by which they can minimize or avoid costly litigation. ... Nothing in the anti-SLAPP statute allows a court to grant a defendants' special motion to strike, but to then 'proceed to trial.'" *Clackamas River Water v. Holloway*, 261 Or. App. 852, 860-61 (2014) (*quoting* Or. Rev. Stat. § 31.152(4)). As this Court held last year,

> [I]t would entirely defeat the purpose of the statute to permit this action to proceed pending the outcome of Plunkett's appeal, in that even if Plunkett were ultimately entirely successful before the Ninth Circuit, absent a stay of trial-court proceedings she would still have been subjected to the necessity of litigating claims from which she presumptively should have been granted complete immunity.

Stay Order, p. 3. Allowing any litigation or discovery to proceed while the issue of anti-SLAPP immunity is pending would be antithetical to this absolute immunity.

### III. The Motion to Lift Stay Is Substantively Unfounded.

Schwern presents no factual basis for circumventing the stay order. Relevant precedent in this Court supports a denial of the Motion to Lift Stay where, as here, the movant has not shown any change in the material facts. *See Thunderbird v. Or. State Dep't of Corrections*, No. 3:08-cv-01404-PK, 2011 U.S. Dist. LEXIS 79336, *51-52 (D. Or. June 28, 2011) (maintaining stay on discovery unrelated to issues presented in pending motions to dismiss; "Nothing has changed that would prompt the court to reconsider this ruling."). *See also id.*, 2012 U.S. Dist. LEXIS 90596, *32-33 (D. Or. May 22, 2012) (stay on discovery not pertinent to issues raised in pending summary judgment motions; plaintiff "has not presented any facts that would prompt the court to reconsider this ruling and require counsel to respond to these new requests. Consequently, the motion should be denied to the extent that it seeks to lift the stay on discovery.").

Schwern's pending motions both boil down to his contention that Plunkett's declaration, stating her belief that Schwern sent her six white roses the day he filed this suit, was false and deserving of Rule 11 sanctions. He offers no facts that support his contention. Instead, Schwern offers excerpts from files he obtained from TaskRabbit, in an end-run around the Stay Order through a subpoena in a separate proceeding. Doc. 46 p. 4; Doc. 45-1 p. 11.

Schwern enumerates seven "reasons why [he contends] these files establish that defendant, or someone acting on her behalf, not plaintiff, placed the TaskRabbit order for the

rose delivery." Doc. 46 pp. 4-5. His seven specious "reasons" fall into two broad categories. In the first, he submits evidence that, if valid, would suggest that the person who ordered the roses knew Plunkett's contact information: the TaskRabbit files include her phone number ("reason" #1), zip code (#2), name (#4) and street address (#5). *Id.* One person who knew that information was Schwern. Her name and cell phone number were the same when they were married, and as Schwern points out, both were publicly available. Doc. 45-2, p. 2. Schwern argues, "Defendant has never presented any evidence tending to establish how plaintiff could have learned" Plunkett's Cambridge street address. *Id.,* p. 5. But she had no need to, as Schwern himself showed the Court that he knew her address on January 27, 2014, the day the flowers were delivered, when he filed a proposed summons listing her address and zip code. Doc. 1-2. And Schwern knew her address at least a month earlier. On December 12, 2013, his Massachusetts attorney went to court to contest a restraining order that, by necessity, lists the address that it orders Schwern to avoid: "YOU ARE ORDERED TO IMMEDIATELY LEAVE AND STAY AWAY FROM THE PLAINTIFF'S RESIDENCE ... located at 1107 Cambridge St. Cambridge, MA or wherever else you may have reason to know the Plaintiff may reside." Doc. 6, p. 6.

Schwern implies that he could not have used Google Street View to figure out the delivery instructions given to TaskRabbit: "1107 is down an alley beside 1111." Doc. 46 p. 6 & Exh. 17. Even if true, Schwern, who calls himself an "internationally renowned open source computer software expert[]" and "one of the top developers working in the Perl programming language in the world today," Complaint ¶¶ 1-2, had more resources at his disposal, as Google reveals.

Using the Google search engine, a search for the term "1107 Cambridge St, Cambridge, MA" yields a top result showing that address on Google Maps, with the next result a link to

Zillow: http://www.zillow.com/homedetails/1107-Cambridge-St-Cambridge-MA-02139/2125468094_zpid/. That Zillow entry describes 1107 Cambridge as "facing a side walkway off Cambridge Street between Inman and Central Square." Exhibit B. The "Bird's Eye" feature on that Zillow page shows a zoomable overhead view that clearly delineates the walkway or alley. Exhibit C. Zillow is not esoteric. Alexa.com, which monitors web traffic, ranks Zillow as the 36th most popular website in the United States. Exhibit D.

An alternate search of Google's search engine, using the term "Cambridge maps," yields several links to Cambridge CityViewer on the first page of results. Cambridge CityViewer is a publicly available computer-based mapping tool offered by the City of Cambridge available at http://www.cambridgema.gov/GIS/interactivemaps/Cambridgecityviewer.aspx. It readily shows that 1107 Cambridge Street (like 1105, 1107-R, and 1109) is not on Cambridge Street proper but down an alley, beside 1111 Cambridge. Exhibit E. The Internet Archive's Wayback Machine reveals that page of Cambridge CityViewer had the same functionality by April 2014. *See* Exhibit F hereto. The site was known outside Massachusetts by then. *See* Exhibit G hereto (*City of Cambridge: CityViewer*, The Scout Report vol. 19 no. 49 (Dec. 6, 2013)).

The second category of Schwern's "reasons" is evidence that, if valid, would suggest that the person who ordered the roses wanted to conceal his identity. Schwern says that the order was placed through the email address whiterose@mailinator.com, and mailinator.com "offers disposable, nonsecure email addresses suitable for hiding the trail of a transaction" ("reason" #3); the order was not placed by a call to the florist directly but through a TaskRabbit account created "three days before the flowers were sent" (#6); that account "was created and accessed using networks designed to obfuscate the user's IP address" (#7), including the TOR network. *See, e.g., United States v. Ulbricht*, No. 14-cr-68 (KBF), 2014 U.S. Dist. LEXIS 145553, *2

(S.D.N.Y. Oct. 10, 2014) ("The Tor network is designed to conceal the Internet Protocol ("IP") addresses of the computers operating on it[.]"); *accord FTC v. Asia Pac. Telecom, Inc.*, 788 F. Supp. 2d 779, 786-87 (N.D. Ill. May 25, 2011). This category of reasons does nothing to clear the technologically savvy Schwern, who had an undeniable motive to conceal his identity when ordering white roses for delivery to his wife: the restraining order issued against him, which the Cambridge District Court had already found cause to extend for another year. Doc. 6, pp. 6-7. Likewise, if payment for the flowers was made on what "appears to be a prepaid Visa debit card" (#4), it would be hard to trace: a prepaid debit card purchaser can provide any name, or no name at all, so the purchaser's use of a debit card listing Plunkett's name as Schwern alleges (Doc. 46, p. 4) shows only that the person who ordered the flowers and used the debit card also knew the name of the intended recipient before placing the order.

Nothing in Schwern's Motion for Sanctions or its supporting memorandum and exhibits shakes Plunkett's belief that Schwern ordered the flowers. Rather, significant evidence can be gleaned from Schwern's "reasons" and from his TaskRabbit files that implicates him. Schwern says,

> Defendant's name appears in the payment information section of the TaskRabbit account. *See* Exhibit 15 at 4. This is because defendant chose to associate her own name with the credit card that she used to place the TaskRabbit order. *See* Exhibit 15 at 19, in which the TaskRabbit staff note their own suspicions concerning this fact...

Doc. 46 p. 5. His summary willfully misreads the notes in the TaskRabbit files, which name "Michael Schwern" as the customer who placed the order, Doc. 45-2, pp. 2, 3, 4 & 5, and elsewhere refer to Schwern as an "investigated user" (presumably after the police investigation) and Plunkett as a "possibly connected user." *Id.* p. 20. The so-called suspicions in the

TaskRabbit files consist of this line: "The credit card he used is under this user's [Plunkett's] name!" *Id.*

The order placed on TaskRabbit bore the title, "Deliver some birthday roses to my wife," and this fuller description: "Pick up six white roses and deliver them on Monday for my wife's birthday. Please include a note or card that says, 'Sophia Magdalena, I will always remember.'" *Id.* p. 18. Sophia Magdalena Scholl, also known as Sophie Scholl, was one of the six executed members of the White Rose; she was guillotined by the Nazis for distributing anti-Nazi literature.   Plunkett believes in good faith that Schwern arranged for the flower delivery. *See* Doc. 6, ¶ 10 ("I believed [the six white roses] had been sent by plaintiff because we had shared an interest in World War II history, and at one time had discussed the story of the execution of six leaders of White Rose, a German resistance group."). "She interprets her receipt of the roses as a coded threat from Schwern." Doc. 21, p. 10. The inclusion of this message with its coded reference to silencing speech, timed to arrive on the day this defamation suit commenced, only lends greater credence to her belief.

This raises the matter of timing. Schwern puts forth the theory that, "[i]n light of the context of the parties' relationship and the pending litigation, the evidence points instead to defendant as the true creator of the [TaskRabbit] account." Doc. 46, p. 7. The status of their relationship and the litigation at that time lend his theory no credence. The TaskRabbit files indicate that the roses were ordered, and the TaskRabbit account was created, on January 24, 2014. *Id.,* pp. 2-3. There was no pending litigation between the parties then. Schwern knew, as Plunkett did not, that he was planning to file suit against her on January 27, 2014. She was not served with process until January 31, 2014, and had no knowledge of the Complaint before then. She had moved across the country from Portland to Massachusetts and wanted to put Schwern,

and her experiences with him, behind her. Doc. 6, ¶¶ 6-7. On January 24, 2014, "the context of the parties' relationship" was a restraining order that, on December 12, 2013, had been extended through December 12, 2014, though Schwern had sent counsel to contest it. Doc. 6, ¶ 9 & Exh. 2. Thus, despite Schwern's aspersions, Plunkett had no discernible motive, on January 24, 2014, to create a TaskRabbit account under the pseudonym Michael Schwern to send herself flowers while making Schwern appear responsible. She could not have sought to tip the scales of this action before she was served, or before it commenced.

Schwern's only other evidence is his word. He notes that Plunkett's declaration about the roses is "controverted." Doc. 46 p. 9. But that was true before the stay was imposed. *See* Declaration of Michael G. Schwern, Doc. 15, ¶ 6: "I did not in any way arrange for the delivery of roses or any other item to defendant at any time after she obtained a Massachusetts restraining order against me." The Court recognized Schwern's denial when it ruled on the anti-SLAPP Motion (Doc. 21, p. 10: "Schwern testifies that he did not arrange for the delivery of the roses."). Schwern's denial has not changed, and does not change the validity of the stay.

Schwern's motions do not present any facts that would prompt the Court to reconsider the Stay Order and require Plunkett to respond to the plainly inadequate Motion for Sanctions.

## IV. The Motion to Lift Stay Seeks Irrelevant and Unduly Broad Discovery.

Notwithstanding the stay, "specified discovery" may be allowed "for good cause shown." Or. Rev. Stat. § 31.152(2). To overcome the stay and "obtain discovery, a plaintiff would have the burden to show a need for discovery." *Page*, 249 Or. App. at 457. Schwern has not met this burden in either the Motion to Lift Stay, which is little more than a paragraph, or the Motion for Sanctions it proposes to litigate. He has not shown good cause for circumventing the stay nor for any need for the discovery nor for the other remedies he requests.

Schwern's Motion to Lift Stay seeks discovery indirectly. If the stay were lifted and the Motion for Sanctions heard, it includes broad requests for relief, specifically: striking Plunkett's declaration, or at least the passage about the roses and the police incident report; requiring Plunkett to pay substantially all of Schwern's post-complaint costs and fees; and initiating contempt proceedings, pursuant to which Schwern would seek to compel discovery, including "the examination under oath of defendant and other witnesses." Doc. 46, pp. 9-11.

In construing the Oregon anti-SLAPP statute, the Oregon courts look to case law under the model California Anti-SLAPP statute. Doc. 21, p. 5; *Neumann v. Liles*, 261 Or. App. 567, 573, n.3 (2014). As in Oregon, the California statute allows only "specified discovery" during the pendency of a stay, "for good cause shown." Cal Civ. Proc. Code § 425.16(g). "Obviously, the purpose of the statute would be frustrated if the plaintiff could drag on proceedings for many months by claiming a need to conduct additional investigation." *Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 16 (1995) (construing California statute). "[C]ase law has interpreted good cause in this context to require a showing that the specified discovery is necessary for the plaintiff to oppose the [anti-SLAPP] motion and is tailored to that end." *Britts v. Superior Court*, 145 Cal. App. 4th 1125 (2006) (construing California statute) (collecting cases). Likewise federal courts, pending resolution of a California anti-SLAPP motion, have limited discovery to that "essential to the opposition" to the motion. *Price v. Stossel*, 590 F. Supp. 2d 1262, 1270 (C.D. Cal. 2008), *aff'd in part and rev'd in part on other grounds*, 620 F.3d 992, 999 (9th Cir. 2010); *Metabolife Int'l, Inc. v. Wornick*, 264 F.2d 832, 846 (9th Cir. 2001).

The Motion to Lift Stay, and the Motion for Sanctions it seeks to litigate, want discovery on a wholly collateral issue unrelated to the substance of the anti-SLAPP motion and the merits

of the case. Schwern offers no grounds for discovery untethered to the anti-SLAPP motion before its resolution.

Schwern argues that Plunkett's declaration was "the central piece of evidence" in support of the Anti-SLAPP Motion. Doc. 46, p. 10. But nothing about the roses was material to either party's burden under the Or. Rev. Stat. § 31.150(3) two-step process. Discovery about the roses would neither undermine the Court's determination that Plunkett's (as yet unspecified) statements at issue in the Complaint were made in connection with an issue under judicial consideration or in connection with a public issue, nor help Schwern establish a probability of prevailing on the merits. *See* Doc. 21, pp. 12-15 & 17-26. Beyond their apparently intended *in terrorem* effect, Schwern's roses have no substantive role in this case. His request for fishing-expedition discovery is, aptly, another red herring.

Further, as Section 31.152(2) permits only "specified discovery," a discovery request in the shadow of an anti-SLAPP motion must be "particularized." *Page*, 249 Or. App. at 457. The Oregon Court of Appeals has affirmed a trial court's rejection of a request for "wide-open discovery." *Id.* Schwern's request is not limited in any clear fashion. It envisions contempt proceedings "which could include the examination under oath of defendant and other witnesses." Doc. 46, p. 10. That lack of specificity is another independent reason to deny the request.

Schwern's Motion to Lift Stay and Motion for Sanctions both seek the improper goal of burdensome discovery on irrelevant issues to prolong the toll litigation can take on Plunkett. The transparently weak motions serve only to rack up more billable hours for all parties in this harassing litigation, in hopes of wearing Plunkett down. The Court should not be a party to Schwern's goal to extend his years of marital harassment into the courtroom.

## CONCLUSION

WHEREFORE Defendant Nóirín Plunkett respectfully requests that the Court deny Plaintiff Michael G. Schwern's Motion to Lift Stay Pending Appeal for a Limited Purpose.

Dated: May 29, 2015

                                        Respectfully submitted,

                                        /s/  Dan Booth
                                        Daniel G. Booth (admitted *pro hac vice*)

                                        *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the foregoing document by using the Court's ECF system on this 29th day of May, 2015, thereby causing a true copy of this document to be served electronically upon counsel of record for each other party.

                                        /s/  Dan Booth