Lake James Hammond Perriguey, OSB 983213
lake@law-works.com
Law Works LLC
1906 SW Madison Street
Portland, OR 97205
503-803-5184
Fax 503-334-2340

Dan Booth, MA Bar #672090 (admitted *pro hac vice*)
dbooth@boothsweet.com
Booth Sweet LLP
32R Essex Street
Cambridge, MA 02139
617-250-8602
Fax 617-250-8883

*Attorneys for Putative Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **MICHAEL G. SCHWERN**, <br><br> **Plaintiff**, <br><br> v. <br><br> **PATRICK PLUNKETT**, personal representative of the estate of Nóirín Plunkett, <br><br> **Putative Defendant**. | Case No. 3:14-cv-00146-PK <br><br> **PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF UNDER FED. R. CIV. P. 60(b)(1) and MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(2), (5), and (6)** <br><br> **Oral Argument Requested** |

Putative substitute defendant Patrick Plunkett respectfully replies to Plaintiff Michael Schwern's response (Doc. 69) to his motion for Rule 60(b)(1) relief and motion to dismiss under Rules 12(b)(2), (5), and (6) (Doc. 68; the "Motion"). Plaintiff states no valid grounds to deny the relief sought, as explained below, so Mr. Plunkett again requests that the Court vacate its order (Doc. 64) granting Plaintiff's motion to substitute defendant (Doc. 63), and dismiss this action.

**A. Mr. Plunkett's opposition to substitution complied with the Court's guidance and Plaintiff offers no valid grounds to defer adjudication of the Motion.**

Plaintiff argues that the Motion "does not provide any legal analysis that would support lifting the stay at this time" and "does not even explicitly request that the stay be lifted." Doc. 69 p. 2. The Court expressly advised counsel before the Motion was filed that it could be heard during the pendency of the stay, and Plaintiff offers no valid grounds to "defer the adjudication" of the Motion until the pending anti-SLAPP appeal is resolved. *Id.* pp. 2-3.

On August 15, 2014, the Court stayed this action pending the outcome of defendant Nóirín Plunkett's appeal from the order denying Nóirín's anti-SLAPP motion to strike. Doc. 38. Nóirín died on July 28, 2015. *See* Doc. 61. On November 3, 2015, the Court granted Plaintiff's motion to substitute Nóirín's father as the defendant. Doc. 64. On February 1, 2016, Plaintiff filed an affidavit reflecting service of that motion, which showed that service was made by a non-solicitor, and did not include a notice of hearing. Doc. 67. On February 2, 2016, undersigned counsel emailed the courtroom deputy to raise procedural questions, including: "Rule 25(a)(3) anticipates a hearing on the motion to substitute, though the plaintiff did not serve a notice of hearing. Does the stay postpone that hearing?" Exh. A hereto. In response the Court advised, in pertinent part, "if Patrick Plunkett intends to oppose the motion for substitution of parties, his counsel can file a motion requesting a hearing and that hearing can be held during the pendency of the stay[.]" *Id.* On February 3, 2016, undersigned counsel replied, "Mr. Plunkett does intend to oppose the plaintiff's motion for substitution of parties. I will file a motion requesting a hearing." *Id.* Accordingly, Mr. Plunkett filed the Motion on February 8, 2016. So Plaintiff's counsel, copied on that correspondence, was notified that the Motion would be heard without disturbing the stay. *Id.*

On the grounds that "what is good for the goose is definitely good for the gander," Plaintiff deems it "unfair" to hear Mr. Plunkett's Motion during the pendency of a stay that Nóirín moved

the Court to enter and maintain. *Id.* p. 2. There is no unfairness because Mr. Plunkett was not a party to Nóirín's arguments. Plaintiff elides the point by calling them both "defendant," as if they were identical. *See id.* ("Barring a showing by defendant [Mr. Plunkett] as to why the stay should now be disturbed when defendant [Nóirín] argued so vigorously to the contrary the last time the matter arose ..."). But the gosling sought the stay, not the gander.

It is also not unfair that Plaintiff may not seek shelter from the anti-SLAPP stay. "The anti-SLAPP statute does not protect the proponent of the SLAPP suit." *Makaeff v. Trump Univ., LLC*, No. 10-cv-940-IEG (WVG), 2011 U.S. Dist. LEXIS 13603, *6 (S.D. Cal. Feb. 11, 2011) (staying proceedings against anti-SLAPP movant while denying stay of movant's claims). "An anti-SLAPP appeal 'does not stay proceedings on ancillary or collateral matters which do not affect the judgment or order on appeal even though the proceedings may render the appeal moot.'" *Id.* at *5 (*quoting Varian Med. Systems, Inc. v. Delfino*, 35 Cal. 180, 189 (Cal. 2005)). While the Ninth Circuit has jurisdiction over the issue of Nóirín's immunity from Plaintiff's claims, "[a]n appeal from an interlocutory order does not divest the trial court of jurisdiction to continue with other phases of the case." *Phelan v. Taitano*, 233 F.2d 117, 119 (9th Cir. 1956); *accord Britton v. Co-op Banking Group*, 916 F.2d 1405, 1412 (9th Cir. 1990); *Brennan v. Opus Bank*, 796 F.3d 1125, 1134 (9th Cir. 2015). The Court may not proceed to trial while a defendant appeals on a "right not to be tried" claim, but it may proceed with pre-trial hearings. *United States v. Claiborne*, 727 F.2d 842, 851 (9th Cir. 1984); *see Schering Corp. v. First DataBank, Inc.*, No. C 07-01142 WHA, 2007 U.S. Dist. LEXIS 45813, *11-13 (N.D. Cal. June 18, 2007) (applying *Claiborne* to pending anti-SLAPP appeal).

The Motion's dispositive grounds (whether Plaintiff established personal jurisdiction over, or properly served, Mr. Plunkett; and whether Massachusetts law governs the survival of Plaintiff's claims) are not before the Ninth Circuit, so the stay does not bar the Court from hearing the

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

Motion and disposing of the case on those grounds. The Court "may, in its discretion, modify its own order imposing a stay … for good cause shown." Doc. 60 p. 2. *See Nken v. Holder*, 556 U.S. 418, 433 (2009) (district court's power to stay pending appeal is "an exercise of judicial discretion" whose propriety "is dependent upon the circumstances of the particular case") (*quoting Virginian R. Co. v. United States*, 272 U.S. 658, 672-73 (1926)). If it were necessary to lift the stay to hear the Motion, good cause exists. Deferring the Motion would needlessly postpone Mr. Plunkett's administration of the estate and undermine the purposes of the stay, which the Court imposed to avoid subjecting Nóirín to "the necessity of litigating claims from which she presumptively should have been granted complete immunity," should the Ninth Circuit so find. Doc. 38 p. 3; *accord* Doc. 21 p. 14 (discussing purpose of anti-SLAPP statute to protect "victims of meritless lawsuits calculated to chill protected speech conduct"). A stay "until the issue of immunity was decided … furthers the goal of efficiency for the court and litigants." *Little v. Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). Resolving a dispositive motion would further the same goal. Plaintiff may not proceed against Mr. Plunkett so the case should not linger on the Court docket.

**B.  Plaintiff, not Mr. Plunkett, is responsible for his failure to timely serve.**

"Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). "Once service is challenged, plaintiffs bear the burden of establishing that service was valid under Rule 4." *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004).

Plaintiff has not carried his burden. He asserts that he "properly and timely served defendant with the motion for substitution of parties." Doc. 69 p. 3. Yet his argument consists primarily of excuses for failing to do so. *See id.* pp. 3-6. According to Plaintiff, "the timing of plaintiff's actions

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

in this case was determined in large part by the effect of communications from defendant's counsel." *Id.* p. 3. Plaintiff's attempt to blame his failure on Mr. Plunkett's counsel falls short. Plaintiff and his counsel alone are responsible for their deliberate failure to timely serve Mr. Plunkett the motion and notice required by Rule 25(a)(3) by means permitted under Rule 4.

By July 30, 2015, one day after learning of Nóirín's death, Plaintiff had resolved to pursue his claims against the estate representative, and Plaintiff's counsel had extensively researched the procedural requirements and timeline for substitution. *See* Doc. 69 pp. 3-4; Exh. B hereto. Yet Plaintiff had also resolved to wait a full sixty days, until September 28, 2015, to take any further action. *Id.* ("For now, I will await the appointment of a personal representative .... On September 28, however, if no personal representative has been appointed, I will take action to see that an administrator is appointed."). Informed of Plaintiff's intentions, undersigned counsel replied in pertinent part, "In all likelihood the representative would be Nóirín's father."[1] *Id.* Undersigned counsel drafted and filed, on July 31, 2015, a notice of death and, with Plaintiff's consent, a joint status report. Doc. 61, 62. The notice of death provided Mr. Plunkett's address and declared that undersigned counsel, who had been Nóirín's counsel, did not represent Nóirín's estate.[2]

Over the following two months, Plaintiff's counsel was repeatedly and consistently informed that Mr. Plunkett would likely be the estate's administrator but had not yet been appointed and had not yet engaged undersigned counsel to represent the estate. Plaintiff's next contact with undersigned counsel came in an email sent on Friday, September 18, 2015, after 7:00 PM EST.

---

[1] Plaintiff does not mention this response email, instead stating that after his counsel's email that day, "[s]everal weeks passed" before the next correspondence in September. Doc. 69 p. 4.

[2] "The undersigned counsel, who does not represent Plunkett's estate, will serve this notice upon Plunkett's father ... I further certify that I shall personally serve a true copy of the foregoing document on this 31st day of July, 2015 upon defendant Nóirín Plunkett's father, Patrick Plunkett of 15 Trees Road, Mount Merrion, Co Dublin, Ireland." Doc. 61 p. 2; *see also* Doc. 68 p. 13.

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

Doc. 69 p. 5; Exh. C hereto. Undersigned counsel replied on September 21, 2015, "I'm not administering Ms. Plunkett's estate. I'll let you know if it turns out that I will be representing the estate's representative for purposes of Mr. Schwern's lawsuit." *Id.* The next day undersigned counsel added, "It's my understanding that no personal representative has yet been named. I believe Nóirín's father Patrick Plunkett will be the personal representative of the estate .... Though I have not yet been retained by him, I expect I will be." *Id.* Again, on October 1, 2015, undersigned counsel notified Plaintiff, "I have not yet been retained as [Mr. Plunkett's] counsel, but I expect I will be soon after he returns to Ireland next week." Exh. D hereto.

Plaintiff argues that "Defendant's counsel, through his September 22[, 2015] email, actively procured plaintiff's counsel's forbearance, explicitly holding out the prospects of acceptance of service and an assented-to or joint motion for substitution." Doc. 69 p. 6. Plaintiff's counsel had asked undersigned counsel, on September 18, 2015, whether the estate would accept service through counsel, *see* Exh. C, but Mr. Plunkett had not yet engaged counsel so any firm response would have been premature. The September 22, 2015 email stated in pertinent part:

> Mr. Plunkett is out of the country and out of phone and email contact until October 5. When he returns to Ireland I expect to resolve my engagement in short order. If you'll postpone your motion until October 14, we should then be in a better position to let you know who will be administering the estate, whether we can accept service, and whether the motion might be assented-to or joint.

> Exh. C.

While that email did not foreclose the possibility that Mr. Plunkett might assent to service or to substitution, it could not, and it made no promises, emphasizing that Mr. Plunkett had not yet retained counsel. Accordingly, Plaintiff's counsel was well aware that undersigned counsel did not yet represent Mr. Plunkett, and so could not "hold out the prospect" that he would freely submit to service through counsel, or to being made a substitute defendant. And as Plaintiff's counsel

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

was also informed that Mr. Plunkett was then incommunicado, Plaintiff knew that undersigned counsel had no way to even ascertain any answers to his questions. *Id.*

Plaintiff was not misled. Once Mr. Plunkett did retain undersigned counsel to represent the estate in this action, Plaintiff's counsel was duly notified, on October 20, 2015. Doc. 69 p. 6; Declaration of Dan Booth ("Booth Decl.") ¶ 6. Mr. Plunkett was appointed the estate's personal representative on October 21, 2015. Doc. 63 pp. 1-2; Exh. E hereto. Undersigned counsel told Plaintiff's counsel of that appointment two days later. Booth Decl. ¶ 8. On October 26, 2015, for the first time since Mr. Plunkett retained undersigned counsel, Plaintiff's counsel inquired, "Will the estate itself be moving to substitute in as a party or will I need to file the appropriate motions?" Exh. F. hereto. Within 15 minutes undersigned counsel responded, "The estate will not move to be made a substitute defendant." *Id.* Plaintiff's counsel replied, "OK, I will file the motions," *id.*, without asking if personal service would be waived or accepted by counsel.

Plaintiff had no reasonable basis to infer that Mr. Plunkett would volunteer to be sued on Nóirín's behalf. Plaintiff should have seen the notice of death as a defensive act to protect the estate and reacted accordingly.[3] Neither Mr. Plunkett nor his counsel made Plaintiff wait until October 26, 2015 to determine that he would need to move to substitute pursuant to Rule 25, or wait until after he filed the motion on October 27, 2015, to determine that Rule 25 mandates service. Doc. 63. On October 29, 2015, the courtroom deputy inquired on behalf of the Court whether Mr. Plunkett planned to file a formal response to the motion to substitute; undersigned counsel responded, "Mr. Plunkett will not oppose the motion, as long as it is properly served on him consistent with Rule 25." Exh. G hereto. The courtroom deputy pointed out, in an email to

---

[3] *See generally Kasting v. Am. Family Mut. Ins. Co.*, 196 F.R.D. 595, 599 (D. Kan. 2000) ("In practice, it is not unusual for a defendant to suggest death upon the record to impose upon the plaintiff's side the obligation to move for the substitution of a party, as a tactical maneuver of an adversary premised upon expediting the action or getting it dismissed.").

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

Plaintiff's counsel the next day that the motion to substitute had been filed without a certificate of service. *Id.* Undersigned counsel replied that afternoon, on October 30, 2015, that Rule 25 required that the motion be "made" (that is, filed) within 90 days of the notice of death, as Plaintiff had done. *Id.* Based on that email, Plaintiff argues that Mr. Plunkett "cannot be heard to invoke" Rule 25's 90-day limit. Doc. 69 p. 6.

Yet Plaintiff's response does not dispute that Rule 4(m)'s distinct timeline for service applies to the motion to substitute. *Id.* pp. 6-7; *see* Doc. 68 pp. 12-14. Undersigned counsel's October 30, 2015 email stated that service would be required "within a reasonable time," citing the Rule 4(m) 120-day (now 90-day) period, under which Plaintiff still had a month to properly serve. Exh. G. That was more than four months ago, and that reasonable time has passed. Plaintiff accepts that he bore the "responsibility to effect service within a reasonable time." Doc. 69 p. 7 (citing Doc. 68 p. 5 and authorities cited in the Motion). Mr. Plunkett and his counsel did nothing to encourage Plaintiff's unreasonable delay.[4]

Moreover, neither Mr. Plunkett nor his counsel ever suggested that service of a motion to substitute would suffice without the notice of hearing Rule 25(a)(3) expressly requires, or if served by means to which Ireland does not assent under the Hague Convention. Plaintiff has never attempted service of his motion to substitute that complies with the Rules.

Plaintiff freely admits that he "did not include a notice of hearing with his motion. That choice on plaintiff's counsel's part was deliberate[.]" Doc. 69 p. 8. He emphasizes that "there *was* no hearing on plaintiff's motion scheduled at the time plaintiff made the motion," *id.*, as though

---

[4] As that October 30, 2015 email noted, "nothing required Mr. Schwern to wait for the probate court to take action before filing his motion, and ... there has never been any suggestion that anyone other than Mr. Plunkett would be the appropriate representative for the estate to make a substitute party." Ex. G. Nothing undersigned counsel said in that email about service caused any prejudice, as Plaintiff claims he complied with the Hague Convention that day. Doc. 69 p. 7.

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

Plaintiff had no responsibility to request and obtain from the Court a hearing date. *See also id.* ("how could plaintiff have served defendant with a notice of a nonexistent hearing?"). Plaintiff never tried to place such a hearing on the Court's schedule, and fails to explain why he did not.

Plaintiff somehow considers it "unsurprising" that he did not obtain a hearing date and serve notice of a hearing, as Rule 25 requires, because Mr. Plunkett specifically informed the Court's deputy that he would require service "consistent with Rule 25." *Id.*; Exh. G. Plaintiff's willful decision to circumvent Mr. Plunkett's right to due process is surprising and inexcusable. If Plaintiff were truly concerned that "no notice of hearing could be served ... [because a hearing] would be inconsistent with the stay," *id.*, he could have requested leave of court to postpone a hearing on substitution until after the pending appeal.[5] Instead Plaintiff chose to violate the Rules without leave. Plaintiff claims that he sought to serve the motion to substitute by mailing it to Ireland's Central Authority on October 30, 2015, but admits that he intentionally did not seek to serve the mandatory notice of hearing, and that even this incomplete service was not consummated. Doc. 69 p. 7. Plaintiff does not show that the Central Authority ever received any such mailing. *See* Exh. I hereto (February 4, 2016 emails by Plaintiff's counsel contending, "we did place the motion for service with the Central Authority... The Central Authority was dilatory and unresponsive. To this day they have not returned any of our followup communications.").

Plaintiff's belated attempt to serve outside the Central Authority also omitted a notice of hearing, and further failed because it was made through Andrew Weir, a private process server, *see* Doc. 67. Plaintiff claims that he "sought to procure service through a solicitor's office." Doc. 69 p. 7. He did not. Plaintiff represents that Weir is "a solicitor based in Northern Ireland." *Id.* He is

---

[5] The Court ordered just such a postponement of the hearing on Plaintiff's motion for sanctions. Doc. 45; *see* Doc. 60 pp. 6-7. Plaintiff could also have filed another motion to lift stay. Doc. 44.

not.[6] The Law Society of Ireland, the professional body for solicitors in Ireland, does not list Weir on its Roll of Solicitors in Ireland, or its list of Registered Lawyers entitled to practice in Ireland under European law. *See* https://www.lawsociety.ie/Find-a-Solicitor/; https://www.lawsociety.ie/Documents/PC_membership/RL-List.pdf; Booth Decl. ¶ 12. Weir does not hold himself out as a solicitor. While his affidavit of service was witnessed by a solicitor in Northern Ireland, it describes Weir in other terms, as only "a process server in the jurisdiction in which service was effected." Doc. 67. Weir's LinkedIn profile also does not call him a solicitor. Exh. H hereto. It indicates no higher education, listing his education at Gransha Boys, a secondary school. *Id*. Weir claims 24 years of "Process Serving and Private Investigations" experience as director of Professional Information Agency. *Id*. Plaintiff engaged that agency to serve Mr. Plunkett. *See* Doc. 67, Doc. 69 p. 7. Its website does not claim that it is a solicitor's office or employs any solicitors in any country. *See* http://www.processserversireland.com/; Doc. 69 p. 7; Booth Decl. ¶ 13.

Not all process servers are solicitors. One in Northern Ireland, like Weir, is not a solicitor in the foreign jurisdiction of Ireland. *See* Doc. 68 p. 10. It is irrelevant that Weir may have authority to serve some legal documents in Ireland. *Id.*; *see* Doc. 69 p. 7. He could not make service of the motion to substitute effective to establish jurisdiction under Rule 4(f). Ireland overtly rejects Plaintiff's misbegotten alternate means of service. *See GCUI-Employer Ret. Fund v. Coleridge Fine Arts*, No. 14-2303-EFM-GLR, 2015 U.S. Dist. LEXIS 17007, *3-4 (D. Kan. Feb. 12, 2015) (Ireland accepts service through its Central Authority, but objects under the Hague Convention to service through third parties other than "directly through a solicitor in Ireland").

---

[6] Plaintiff had notice that these assertions are unfounded. On February 4, 2016, weeks before Plaintiff's response, undersigned counsel sent emails to Plaintiff's counsel enumerating evidence that Weir is not a solicitor and his office is not a solicitor's office. *See* Exh. I.

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

Plaintiff's obligation to serve arose on July 31, 2015. Doc. 61. Mr. Plunkett reminded Plaintiff of that obligation 130 days ago, on October 29, 2015. Exh. G. Plaintiff informed the Court that he was effecting service through Ireland's Central Authority. *Id.*; *see also* Doc. 65 p. 2 ("Plaintiff has taken all the necessary steps under the Hague Convention to effect personal service of the motion in this Court on Mr. Plunkett in Ireland"). On December 1, 2015, Plaintiff conceded that service had "not yet been perfected." Doc. 65 p. 1. Abandoning that method, he employed Weir.

Plaintiff has not filed a motion for an extension of time to properly serve.[7] Plaintiff has not sought to attribute his failure to properly serve to excusable neglect.[8] Instead Plaintiff rests on his past efforts, falsely contending he "accomplished actual and legally binding service of process within a reasonable time." Doc. 69 p. 7. Those efforts cannot be ratified. By his own admissions, Plaintiff has intentionally failed to timely and properly effect service of the motion to substitute, so the order granting that motion should be vacated pursuant to Rule 60(a), and the complaint should be dismissed pursuant to Rules 12(b)(2) and 12(b)(5).

## C. Massachusetts has a more significant relationship with the action and the parties than Oregon so its substantive law governing survivorship applies.

Plaintiff argues that Oregon's law governing the survival of tort claims applies. Doc. 69 p. 9. He and Mr. Plunkett agree that a material conflict of Oregon and Massachusetts' laws governing survivorship exists, which is to be resolved under Oregon's choice of law rules by applying the law of the state "with the most significant relationship to the parties and their dispute." Doc. 68 p. 16 (*quoting Bixby v. KBR, Inc.*, 895 F. Supp. 2d 1075, 1089 n. 4 (D. Or. 2012); Doc. 69 pp. 8-9. Oregon courts "follow the Restatement (Second) of Conflict of Laws § 145 (1971) approach for

---

[7] *See Breaux v. ASC Indus.*, 298 F.R.D. 339, 348 (N.D. Tex. 2013) ("the non-filing of a motion under Rule 6(b) to allow substitution out-of-time constitutes a waiver of such a request") (*citing Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 470 (2d Cir. 1998)).

[8] *See* Doc. 68 pp. 12-13 (discussing Plaintiff's inexcusable neglect).

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

determining what substantive law should apply in tort cases." *Fields v. Legacy Health Sys.*, 413 F.3d 943, 952 (9th Cir. 2005) (*citing DeFoor v. Lematta*, 249 Or. 116, 437 P.2d 107, 108 n. 5 (Or. 1968)).

> Under the Restatement, a court should consider the following contacts to determine which state has "the most significant relationship" to the case: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.

*Id.* (*quoting* Restatement (Second) of Conflict of Laws § 145(2)(a)-(d)); *Sarver v. Chartier*, No. 11-56986, 2016 U.S. App. LEXIS 2664, *11 (9th Cir. Feb. 17, 2016) (same). "The law selected by application of the rule of § 145 determines whether a claim for damages for a tort survives the death of the tortfeasor or of the injured person." Restatement (Second) of Conflict of Laws (hereafter, "Restatement") § 167. An analysis guided by the four-factor Restatement test identifies Massachusetts as the state with the most significant relationship with the parties and the dispute, so its survivorship law applies, and precludes Plaintiff's claims. See Doc. 68 pp. 15-20.

**1. The first Restatement factor is not strongly weighted in favor of either Massachusetts or Oregon law, but it weighs more toward Massachusetts law.**

Addressing the first Restatement factor, Plaintiff asserts that the injury occurred in Oregon. Doc. 69 p. 9. He appears "to assume that ... injury necessarily occurs in the victim's domicile state." *Bobbitt v. Milberg LLP*, 801 F.3d 1066, 1070-71 (9th Cir. 2015). That "general principle may apply in many cases," but does not always hold.[9] *Id.* at 1071. "Our inquiry [into the first factor] focuses not on the place where the victim feels the consequences of the injury, but on the location of injury itself." *Id.* In this case, domicile does not determine the place of injury because the complaint focuses on allegations of "harm to plaintiff's reputation." Doc. 1 ¶¶ 35, 43, 45(a); *see*

---

[9] *See, e.g., Wang v Hsu*, No. C-87-2981-TEH (JSB), 1991 U.S. Dist. LEXIS 4398, *110 (N.D. Cal. Mar. 1, 1991) (San Francisco attorney's defamation injury was supported by "his professional standing in the intellectual property international legal community," specifically including among participants in a Taipei seminar).

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

*also id.* p. 1 ("Good name in man and woman, dear my lord/Is the immediate jewel of their souls.") (quoting William Shakespeare, *Othello*, Act III, Scene 3). "Reputation ... is external. It is the community's perception of an individual's character." *Shirley v. Freunscht*, 303 Or. 234, 238 (1987). "The gravamen of the tort of defamation is the injury to the plaintiff's reputation." *Id.* (citations omitted). "[T]he identity of the relevant reader or listener varies according to the context. In determining whether a falsehood is material to a defamation claim, we care whether it affects the subject's reputation in the community." *Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 863, 187 L. Ed. 2d 744, 759 (2014). For purposes of the first Restatement factor, in defamation, "by far the greatest interest lies in the place where the victim's reputation suffered injury." *Dowd v. Calabrese*, 589 F. Supp. 1206, 1211 (D.D.C. 1984).

Plaintiff alleged he operates in, and was injured in, "the open source software development community." Doc. 1 ¶ 1. "It is uncontested that each of Schwern's claims arises in material part out of statements purportedly made by [Nóirín] Plunkett to ... third parties[.]" Doc. 21 p. 13. Plaintiff's claimed injuries are based on the alleged effects of those statements on open-source community members and organizations. *Id.* pp. 7 & 19; Doc. 1 ¶¶ 15-19, 24-27, 31-32.

The open-source software development community, the place of Plaintiff's alleged injuries, is decentralized, not localized. *See* Doc. 68 pp. 19-20; *Jacobsen v. Katzer*, 535 F.3d 1373, 1378-79 (Fed. Cir. 2008) ("Open Source software projects invite computer programmers from around the world to view software code and make changes and improvements to it."); Greg R. Vetter, *The Collaborative Integrity of Open-Source Software*, 2004 Utah L. Rev. 563, 567 (2004) ("The Internet allows far-flung development teams to collaboratively create software."). Plaintiff agrees. *See* Doc. 1 ¶¶ 24 ("By its nature, the open source movement depends heavily on an ongoing and open exchange of information among its participants."). The complaint did not allege that Plaintiff's

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

reputation in that community, or his injuries, were solely or even primarily in Oregon; rather, that he is an "internationally renowned computer software expert" with "networks of colleagues and friends in multiple states and countries" that "communicate heavily over the internet." *Id.* ¶¶ 1-2.

Because the place of injury is geographically diffuse, the first factor bears less weight. "[I]t is difficult to identify, let alone place great weight upon, the location of [Plaintiff's] alleged injury." *Sarver*, 2016 U.S. App. LEXIS 2664, *12 ("[plaintiff's] claims of reputational harm by those who knew him would have presumably been felt not only in the location he lived ... but also where his various friends and family live..."). Since the "alleged injuries would most likely have occurred in multiple states, 'the place of injury will *not* play an important role in the selection of the state of applicable law.'" *Id.* *13 (quoting Restatement § 145 cmt. e) (emphasis in original).

So limited, the first factor favors Massachusetts law. Any injury to Schwern's reputation in the open-source community would be most significant in Massachusetts, where that community is larger and more prominent than in Oregon. The Open Source Initiative,[10]  the open-source movement's standard-setting organization and most prominent advocacy group, identifies only nine OSI-approved "Popular Licenses," none created by Oregon-based organizations, while three were created by organizations based in Massachusetts: one created by the Massachusetts Institute of Technology and two by the Boston-based Free Software Foundation, including its GNU General Public License. *See* https://opensource.org/licenses. Plaintiff identifies himself as "one of the top developers working in the Perl programming language in the world today." Doc. 1 ¶ 2; *see* also Doc. 16 p. 12 (2011 Ada Initiative blog post calling Plaintiff "a noted Perl hacker"). Perl is itself distributed under the GNU General Public License, and Perl programmers are both

---

[10] *See generally* Notice, General Services Admin., *GSA's General Innovation and Strategy Hack-a-Thon*, 80 Fed. Reg. 55,628, 55,630 (Sept. 16, 2015) (listing criteria for Open Source Initiative certification). "'Open source' refers to a program in which the source code is available to the general public for use and/or modification from its original design free of charge." *Id.*

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

more active and more coveted in Massachusetts than in Oregon. Boston.pm, the Boston chapter of Perl Mongers (an umbrella term for regional Perl programmer user groups) has 134 members, almost twice as many as the 74 members (including Plaintiff) in the Portland chapter. Booth Decl. ¶ 15. A 2005 Perl Mongers census, while it stated that "Perl Mongers are famously difficult to count," found that only the London and Seattle chapters had bigger mailing lists of users than Boston.pm Perl Mongers 2005 Census pp. 2 & 10, http://www.pm.org/census.pdf; Booth Decl. ¶ 16. Searches for "Perl" job opportunities on Monster.com yield a list of 993 Perl Jobs in Massachusetts and only 245 Perl Jobs in Oregon. Booth Decl. ¶ 17. Likewise, a search for "perl" job opportunities on LinkedIn Jobs restricted to the Greater Boston area returns 902 results, while the same search restricted to the Portland area returns 203 results. *Id.* ¶ 18. Any harm to Plaintiff's reputation or professional opportunities would be more significant in Massachusetts.

**2. The second Restatement factor, the place where the conduct occurred, weighs strongly in favor of applying Massachusetts law.**

The second Restatement factor, where the conduct causing the injury occurred, is of greater importance because the alleged injury occurred in more than one state. Restatement § 145 cmt. e ("When the injury occurred in two or more states ... the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law."). Plaintiff concedes that the second factor "arguably" supports applying Massachusetts law, but contends "that *not* all, or even necessarily most, of the behavior of which he complains occurred in Massachusetts." Doc. 69 p. 9. The complaint alleges little or no tortious behavior in Oregon, and pleads those allegations with little specificity. Almost every tortious act alleged came after Nóirín left Oregon. The second factor strongly favors applying Massachusetts law.

Plaintiff's core allegation is that "[i]n addition to her statements to medical personnel, police, and prosecutors, [Nóirín], on and after September 19, 2013, intentionally made false and

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

unprivileged claims to other third parties that plaintiff had sexually abused defendant and subjected defendant to intimate partner violence." Doc. 1 ¶ 13. Yet Plaintiff admits that Nóirín's statements to medical personnel, police, and prosecutors on and after September 19, 2013 were privileged. Doc. 1 ¶¶ 10, 13; Doc. 14 p. 7. Plaintiff alleged only harms arising after he and Nóirín filed for divorce on September 19, 2013, noting that Nóirín "planned to move to Massachusetts on September 23 [, 2013]." *Id.* ¶ 8. Plaintiff does not dispute that Nóirín in fact moved to Massachusetts on September 21, 2013 and resided there until July 2015. *See* Doc. 6 ¶ 6; Doc. 69 p. 3. The complaint identifies just one person in Oregon to whom Nóirín allegedly made any "unprivileged false claims about plaintiff" in the less than two-day period before that move. Doc. 1 ¶ 20. By comparison, Plaintiff alleged that Nóirín "made unprivileged false claims about plaintiff" to two people in or around Boston after moving to Massachusetts, including the only such alleged claim pleaded with any specificity. *Id.* ¶¶ 21-22; *see* Doc. 19.

The only other allegation related to any third party in Oregon involves a blog post on the Stumptown Syndicate website almost two months after Nóirín left Portland. Doc. 1 ¶ 19. The complaint did not allege that Nóirín communicated with any member of Stumptown Syndicate's board on or after September 19, 2013, and the blog post specifies that it was prompted by Plaintiff himself. *Id.*; *see* Doc. 16 p. 11 (Exh. 7) ("Michael Schwern has reached out to us ...").

All other such allegations of false statements involve third parties outside of Oregon, mostly after Nóirín relocated to Massachusetts. Doc. 1 ¶¶ 13-23; *see* Doc. 68 p. 20. To the extent that the complaint can be construed to allege that Nóirín made any tortious statements to any of the September 30, 2013 Geek Feminism blog post's co-signers, Doc. 1 ¶¶ 15 & 18, Doc. 16 pp. 1-3 & 7-8 (Exhs. 1-3 & 6), that conduct did not occur in Oregon; one of the seven co-signers lives in Australia, another lives in Madison, Wisconsin, and the five others live in San Francisco. Booth

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

Decl. ¶ 15. Likewise, if the complaint could be construed to allege that Nóirín made any tortious statements to Valerie Aurora or other "Ada Initiative leaders" in relation to the nonprofit's September 25, 2013 blog post, Doc. 1 ¶¶ 16-17 & Doc. 16 pp. 4-5 (Exhs. 4-5), that conduct did not occur in Oregon: Aurora lives in San Francisco and the nonprofit's other founder Mary Gardiner lives in Australia. Booth Decl. ¶ 16.

Of the third parties alleged to have acted in response to statements by Nóirín, more are in Massachusetts than in Oregon, while even more are in California. *See* Restatement § 145 cmt. e ("when a person in state X writes a letter about the plaintiff which is received by a person in state Y, the local law of Y, the state where the publication occurred, will govern most issues involving the tort" unless other factors make a different state the state with the most significant contacts). Despite the vagueness in the complaint, it is apparent that the second factor weighs in favor of applying the laws of Massachusetts, where more of the tortious conduct was alleged.

**3. The third Restatement factor, the location of the parties, is split equally between Massachusetts and Oregon, and carries little weight in this analysis.**

The third Restatement factor is the location of the parties. It favors neither Massachusetts nor Oregon, as Plaintiff recognizes. Doc. 69 p. 9; *see* Doc. 68 p. 20. This factor also carries relatively little weight. *See Fields*, 413 F.3d at 953 ("that one of the parties is domiciled … in a given state will usually carry little weight of itself") (*quoting* Restatement § 145 cmt. e).

**4. The fourth Restatement factor favors applying Massachusetts law because the relationship between Plaintiff and Nóirín, and that between Plaintiff and Mr. Plunkett, were both centered in Massachusetts at the relevant times.**

The fourth Restatement factor is "the place where the relationship, if any, between the parties is centered." The Motion notes Plaintiff's relationship with Irish national Mr. Plunkett exists only through the Massachusetts estate he administers. *See* Doc. 68 p. 20. Plaintiff considers that focus

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS

inapposite and points instead to his former relationship with Nóirín. Doc. 69 p. 9. The fourth factor also supports applying Massachusetts law to that former relationship.

Plaintiff erroneously construes this factor as implicating his relationship with Nóirín long before any tortious act he alleges. *Id.* (discussing Oregon as "the place where the parties lived together during their marriage [and] where they divorced"). Under the Restatement, "the place where the relationship is centered is another contact to be considered" only "[w]hen there is a relationship between the plaintiff and the defendant and when the injury was caused by an act done in the course of the relationship." Restatement § 145 cmt. e; *see Jones v. Winnebago Indus.*, 460 F. Supp. 2d 953, 971-72 (N.D. Iowa 2006). The complaint alleges no injuries before they filed for divorce, on September 19, 2013, so the injuries Plaintiff claims were not caused by an act in the course of their marriage. Nóirín left Oregon on September 21, 2013, never to return, and abandoned the criminal case against Plaintiff "to try and put plaintiff and my experiences with him behind me." Doc. 6 ¶¶ 6-7. *See also id.* p. 5 ("I left Oregon to escape the abuse").

After the divorce, what little remained of their relationship would be primarily centered in Courtroom 2 of the Cambridge District Court in Medford, Massachusetts, where Nóirín obtained an abuse prevention order against Plaintiff two months later, on November 21, 2013. Doc. 6 pp. 6-7. Nóirín filed an affidavit in the Massachusetts Court on that day, declaring that Plaintiff, on or about November 12, 2013, had "sent me an email asking me to talk to him on our anniversary." *Id.* p. 4 & ¶ 8. (Plaintiff denied it. Doc. 15 ¶ 5.) From then on, the Massachusetts court controlled the nature and terms of their relationship, ordering Plaintiff not to abuse, contact, or come within 100 yards of Nóirín, and to stay away from Nóirín's residence and workplace. Doc. 6 p. 6. Judge Singleton, who entered the order on November 21, 2013, extended

it for ten days on December 2, 2013, and then for a full year on December 12, 2013, in a proceeding contested by Plaintiff's Massachusetts attorney. *Id.* ¶¶ 8-9 & pp. 6-7.

A Massachusetts "abuse prevention order is primarily addressed to the defendant." *Caplan v. Donovan*, 450 Mass. 463, 470 (Mass. 2008). Yet its aim is centered squarely on Massachusetts.

> A court order that prohibits the defendant from abusing the plaintiff and orders him to have no contact with and to stay away from her -- provisions that appear in the abuse prevention order issued in this case -- serves a role analogous to custody or marital determinations, except that the order focuses on the plaintiff's protected status rather than her marital or parental status. Such an order furthers the Commonwealth's important public policy goal of securing the fundamental human right to be protected from the devastating impact of family violence ... by declaring the protected status of a person who is currently domiciled in this Commonwealth after coming here to escape from abuse.

*Id.* at 469 (internal quotation marks and citations omitted). Their relationship was then remote, intermediated, and circumscribed by the protections of the Massachusetts order.[11]

For purposes of the fourth factor, whether Plaintiff's relevant relationship was with Nóirín between September 19, 2013 and July 28, 2015, or is with Nóirín's estate administered by Mr. Plunkett since October 21, 2015, it has been primarily governed and controlled by a Massachusetts court: either the Cambridge District Court, or the Middlesex Probate and Family Court. In either event, Massachusetts is the nexus and center of the relationship.

**5.  In total, the Restatement factors favor application of Massachusetts law.**

"[T]he Restatement is designed to avoid a formulaic approach. Rather, courts must evaluate how much weight should be allotted to each of the factors given the specific facts of the case." *In re Mayer*, No. ID-10-1299-JuMkH, 2011 Bankr. LEXIS 2062, *10 (Bank. 9th Cir. May 24, 2011);

---

[11] Absent direct communication between the parties thereafter, Plaintiff alleged that Nóirín had talked *about* him with two mutual acquaintances in Massachusetts. Doc. 1 ¶¶ 20-21, Doc. 21 pp. 8 & 21-22. On January 27, 2014 Nóirín talked about him with the Cambridge Police Department, reporting a flower delivery received that afternoon with no note, "strongly believ[ing] the flowers were sent by [Plaintiff] in violation of the restraining order." Id. pp. 8-9. (Plaintiff denied it. Doc. 15 ¶ 6, Doc. 45.) Plaintiff filed the complaint commencing this action that same day.

*see also Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 307 (2007). Measured on a qualitative basis, *id.*, the factors weigh in favor of Massachusetts law. The first factor (the place of injury) favors Massachusetts but does not bear much weight because any injury was diffuse. The second factor (where the tortious conduct occurred) bears more weight and also favors Massachusetts, since almost no material alleged conduct occurred in Oregon. The third factor (the parties' domicile) is effectively neutral and of limited weight. The fourth factor (the center of the parties' relationship) also favors applying Massachusetts law. All told, the strongest factors support Massachusetts law and none support Oregon law. Oregon's choice-of-law rules would select Massachusetts' law of survivorship, under which no claims against Nóirín survive. *See* Doc. 68 pp. 16-18. Therefore the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: March 7, 2016                                  Respectfully submitted,

                                                      /s/  Dan Booth
                                                      Dan Booth

                                                      *Counsel for Patrick Plunkett*

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the foregoing document, its exhibits and supporting declaration, by using the Court's ECF system on this 7th day of March, 2016, thereby causing a true copy to be served electronically upon counsel of record for each party of record.

                                                      /s/  Dan Booth

PATRICK PLUNKETT'S REPLY IN SUPPORT OF MOTION FOR RELIEF AND MOTION TO DISMISS