Lake James Hammond Perriguey, OSB 983213
lake@law-works.com
Law Works LLC
1906 SW Madison Street
Portland, OR 97205
503-803-5184
Fax 503-334-2340

Dan Booth, MA Bar #672090 (admitted *pro hac vice*)
dbooth@boothsweet.com
Booth Sweet LLP
32R Essex Street
Cambridge, MA 02139
617-250-8602
Fax 617-250-8883

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **MICHAEL G. SCHWERN**, <br> **Plaintiff**, <br><br> v. <br><br> **PATRICK PLUNKETT**, personal representative of the estate of Nóirín Plunkett, <br><br> **Defendant.** | Case No. 3:14-cv-00146-PK <br><br> **DECLARATION OF DAN BOOTH IN SUPPORT OF PATRICK PLUNKETT'S MOTION FOR AN AWARD OF ATTORNEY FEES PURSUANT TO FED. R. CIV. P. 54(d)(2), LR 54-3 AND ORS 31.152(3)** |

I, Dan Booth, make this declaration subject to penalty of perjury.

1. The facts set forth herein are within my personal knowledge and, if sworn as a witness, I could and would testify competently thereto under oath.

2. I am a partner of the law firm Booth Sweet LLP, a Massachusetts limited liability partnership, based in Cambridge, Massachusetts.

3. I represented Nóirín Plunkett ("Nóirín"), the original defendant in this action, from April 21, 2015 through Nóirín's death on July 28, 2015. On June 26, 2015, I entered an appearance on behalf of Nóirín in the appeal from this action in the United States Circuit Court for the Ninth Circuit Court of Appeals, No. 14-35576. On October 6, 2015, Patrick Plunkett, the substitute defendant in his capacity as the personal representative of his daughter Nóirín's estate ("Mr. Plunkett"), engaged me to represent him in this Court and in the appeal.

4. I submit this declaration in support of Mr. Plunkett's motion for attorney's fees and costs.

5. Attached to this declaration as Exhibit 1 is a true and correct copy of a letter that Plaintiff Michael Schwern's ("Schwern") counsel sent to Nóirín dated April 8, 2015. At that time, all proceedings in this Court were temporarily stayed pending resolution of the appeal, and Nóirín was proceeding *pro se* after the withdrawal of Erin K. Olson. The letter indicated that Schwern would seek Rule 11 sanctions against Nóirín unless the parties reached a settlement within 21 days, and proposed terms including $1.2 million in payments to Schwern, a public statement that Nóirín had lied about Schwern's sexual assault, and a voluntary dismissal of the Massachusetts abuse prevention order that Nóirín had obtained against Schwern.

6. After receiving that April 8, 2015 letter, Nóirín initially engaged me for the limited purpose of negotiating a possible settlement, and retained me to appear and oppose Schwern's motions only when negotiations failed. Schwern's aggressive litigation strategy required Nóirín to expend significant resources on litigation in this Court despite the pendency of the stay. Nóirín had moved from Oregon to Massachusetts more than a year earlier, and knew of no counsel in Oregon available to serve as substitute counsel with the requisite experience defending defamation claims and litigating anti-SLAPP cases.

7. Attached to this declaration as Exhibit 2 is a true and correct copy of a letter that I sent to Schwern's counsel on behalf of Nóirín on April 24, 2015. The letter included a counter-proposal in which both this action and the appeal would have been dismissed, with both parties to bear their own costs. Schwern's counsel rejected the counter-proposal the same day. Later that day, in an email replying to Schwern's counsel, I wrote: "As part of her proposed settlement terms, Ms. Plunkett offered to walk away from her pending appeal of the anti-SLAPP issue. That means she offered to spare your client the likelihood that he will ultimately bear the significant attorney's fees she has already incurred in litigating the issue. Your client should seriously consider the value of that substantial financial savings before forcing both parties to incur any further unnecessary fees and costs."

8. Mr. Plunkett is a citizen of Ireland who lives and works is Dublin, Ireland. When he retained me after Nóirín's death, Mr. Plunkett knew of my prior involvement in the case, and knew no attorneys in Oregon.

9. Attached to this declaration as Exhibit 3 is a true and correct copy of emails that I exchanged with Schwern's counsel between October 19 and 22, 2015. The October 19, 2015 email from Schwern's counsel included a settlement proposal, whose terms would include payments by the estate of $100,000, plus the legal fees and expenses he claimed in this and other cases involving Nóirín, and cooperation with Schwern's efforts to obtain the security logs for Nóirín's Google account and the contents of all Google chats and emails between Nóirín and Schwern. In his October 22, 2015 email, Schwern's counsel represented that Schwern's legal fees and expenses in this case and others involving Nóirín was then more than $41,200.

10. Attached to this declaration as Exhibit 4 is a detailed itemization by task of legal services performed by my firm related to the proceeding in this Court, reflecting the amounts of time

spent on each specified task by me and by my legal assistant Ethan Moore. The itemization documented in Exhibit 4 is based on entries that I kept contemporaneously.

11. As Exhibit 4 reflects, I billed for $31,227.50 in fees incurred in this Court over the course of the representation, at $425 per hour. That is my established rate currently and ordinarily charged to clients in similar matters, and the actual rate charged to, and paid by, Nóirín and Mr. Plunkett. Pursuant to our retainer agreement, both Nóirín and Mr. Plunkett further agreed to pay, and did pay, $495 per hour for my services during hearings and preparation for hearings, but Mr. Plunkett is seeking only $425 per hour for all of my time in this action.

12. As Exhibit 4 further reflects, my services for Mr. Plunkett directly related to this case included 9.2 hours of services necessarily performed after Nóirín's death and before he was formally designated as the personal representative of the estate on October 21, 2015, which time also included 6.1 hours for services necessarily performed before he engaged our firm to appear in this Court on October 6, 2015. Such necessarily performed work before formal representation is properly compensable. *See Hells Canyon Pres. Council v. United States Forest Serv.*, No. 00-755-HU, 2005 U.S. Dist. LEXIS 15311, *8-9 (D. Or. Mar. 7, 2005).

13. I spent a significant share of my time in this action for Mr. Plunkett involved research and argument on his motion to vacate the substitution order and to dismiss all claims. Though the motion was denied without prejudice to renewal after the appeal, and the Ninth Circuit decision avoids any need for its renewal, those costs were necessarily incurred. A process server from Northern Ireland delivered the complaint to Mr. Plunkett in Ireland on January 18, 2016, and I filed Mr. Plunkett's motion to dismiss on February 8, 2016, 21 days later, as required by Fed. R. Civ. P. 12(a)(1)(A)(i), to contest both the sufficiency of service and the survival of the claims pleaded. As reflected in Docket No. 71-1, the Court advised on

February 2, 2016 that Mr. Plunkett's opposition to substitution could be heard during the pendency of the stay. Any delay would have risked waiving Mr. Plunkett's defenses pursuant to Fed. R. Civ. P. 12(b). As Exhibit 4 also reflects, I waived approximately $3300 worth of fees incurred between November 2015 and February 2016, zeroing out multiple line items on my invoices during that period, to minimize charges to Mr. Plunkett for time spent researching the law and procedure governing substitution of claims and their application in this case.

14. I graduated from Columbia Law School in 2005. I have practiced law ever since, exclusively as a civil litigator. I have significant experience in defending complex defamation and First Amendment cases, often involving the application of state anti-SLAPP statutes similar to Or. Rev. Stat. § 31.150. *See Duffy v. Godfread*, No. 13-cv-1569, 2015 U.S. Dist. LEXIS 111318 (N.D. Ill. Aug. 20, 2015) (applying Minnesota anti-SLAPP Act, Minn. Stat. § 544.01 *et seq.*); *Small Justice LLC v. Xcentric Ventures LLC*, 99 F. Supp. 3d 190 (D. Mass. 2015); *Monsarrat v. Newman*, No. MICV2013-00399-C (Mass. Super. Ct. 2013) (complex defamation case voluntarily dismissed by plaintiff soon after my motion to dismiss); and *Boladian v. Clinton*, No. BC576665 (Cal. Super. Ct. 2015) (anti-SLAPP motion to strike pursuant to Cal. Code Civ. Proc. § 425.16), *appeal pending*, No. B267950 (Cal. Ct. App. 2016).

15. My practice is based in Cambridge, Massachusetts. My only practice in Oregon to date has been in this case in Portland, both in this Court and in the Ninth Circuit on appeal.

16. Attached to this declaration as Exhibit 5 is a true and correct copy of the Oregon State Bar's most recent Economic Survey, conducted in 2012. It is also available at http://www.osbar.org/_docs/resources/Econsurveys/12EconomicSurvey.pdf.

17. I am generally familiar with rates charged for legal services in Boston and Cambridge, Massachusetts, particularly hourly rates among lawyers who focus their practices on First

Amendment and defamation law. Several courts have approved awards of my fees at the $409 per hour rate I customarily charged before 2014. *See Lightspeed Media*, No. 12-cv-889, 2013 U.S. Dist. LEXIS 168615, *19 (S.D. Ill. 2013), *aff'd*, 761 F.3d 699; *Shirokov v. Dunlap, Grubb & Weaver PLLC*, No. 10-cv-12043, 2014 U.S. Dist. LEXIS 40642, *5 (D. Mass. Mar. 27, 2014). I believe that the hourly rates charged by me and Mr. Moore in this appeal are at or below the level of fees customarily charged by legal counsel in Boston and Cambridge for comparable work.

18. Attached to this declaration as Exhibit 6 is a detailed itemization of costs and expenses incurred by my firm in the course of this action in this Court. Exhibit 6 is based on entries that I kept contemporaneously. It reflects that my firm billed our client for $2,129.20 in costs in this Court. All such non-taxable costs itemized are properly recoverable as attorney's fees because they were billed directly to Mr. Plunkett and are not overhead expenses already reflected in our hourly rates or fees.

19. The costs our firm incurred in this action were primarily for electronic evidence preservation necessarily incurred as a result of Schwern's actions in this case. On July 30, 2015, two days after Nóirín's death, Schwern's counsel sent me an email explaining Schwern's intention to proceed against the estate. A true and correct copy of that email and my response is on the docket at Docket No. 74-1 in this action. In that email, Schwern's counsel stated, "**Ms. Plunkett's estate has a duty to preserve evidence in its possession or control, including electronic evidence, that is or may become relevant to the issues in this litigation.** *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-218 (S.D.N.Y. 2003). I trust that you will inform the personal representative, when one is named, of the importance of complying with this duty. I also trust that you will each instruct any potential witness, records custodian, or other

interested person with whom you have contact of this duty insofar as it applies to them." Complying with Schwern's demands required significant expense. The next day, July 31, 2015, I accompanied Mr. Plunkett as he and his family entered Nóirín's Cambridge apartment to collect and ship her personalty to Ireland. I collected and secured all electronic devices, not knowing which might include any electronic evidence that could later be subject to discovery. Before those devices could be shipped to Ireland, at Mr. Plunkett's instance, I undertook to comply with Schwern's demand to preserve the electronic evidence through forensic imaging. We determined, after obtaining quotes from several outside vendors, that the forensic imaging could be performed in-house at a significant savings.

20. Ethan Moore, an associate at our firm admitted to practice law in 2013, had worked as a technician and trainer for Apple Inc. before law school. After documenting an inventory of all Nóirín's computer and electronic devices, Mr. Moore personally conducted the forensic imaging of Nóirín's MacBook Pro and all laptops, hard drives, thumb drives, and cell phones, copying all data onto a separate, dedicated hard drive. Mr. Moore spent 14.8 hours in those services, which were billed to Mr. Plunkett at a legal assistant rate of $125 per hour, for a total of $1,850. An additional $159.36 was expended on the dedicated hard drive used to securely store the forensic images. The use of Mr. Moore for these technical services resulted in substantial savings to Mr. Plunkett because otherwise his services would have been billed by an outside vendor at rates several times higher than those charged. Mr. Plunkett also incurred an additional $119.84 in international shipping costs in November 2015 for the electronic devices after the imaging was complete. Those costs were necessarily incurred as a direct result of Schwern's preservation demand, without which Mr. Plunkett would have brought the devices back to Ireland personally in July and avoided the later shipping expense.

21. In addition, the $100 charged for my *pro hac vice* admission, billed separately to Nóirín as an itemized expense by Mr. Perriguey, is properly recoverable as part of the award because that was also "reasonably necessary to prosecute the case." *Adidas Am., Inc. v. Payless ShoeSource, Inc.*, No. 01-1655-KI, 2009 U.S. Dist. LEXIS 9482, *5-6 (D. Or. Feb. 6, 2009).

Dated: February 17, 2017                                /s/ Dan Booth
                                                        Dan Booth